Marx, Appellant, v. Industrial Commission and others, Respondents.

*December 4, 1959—January 5, 1960.*

For the appellant there was a brief and oral argument by *Charles G. Giles* of Medford.

For the respondent Industrial Commission the cause was argued by *Mortimer Levitan,* assistant attorney general, with whom on the brief was *John W. Reynolds,* attorney general.

DIETERICH, J. The sole question before us goes to the issue as to whether or not appellant's present disability of degenerative osteoarthritis was aggravated or accelerated by the injury he incurred on December 1, 1954.

The appellant, Roy W. Marx, was forty-seven years of age, weighed 137 pounds, and was five feet, three inches tall, on December 1, 1954, the date of the alleged injury. Roy W. Marx became employed by the Hurd Millwork Corporation, Medford, Wisconsin, as a general laborer in September, 1954. Prior to December 1, 1954, Roy Marx had suffered no injuries or pain, or was ever confined to a hospital because of any injury or pain, or missed work because of any injury or pain.

On December 1, 1954, about 3 p. m., Roy Marx and Lawrence Marschner, another employee, were unloading a boxcar of lumber. Roy Marx fell four and one-half to five feet, striking the frozen ground with his head, neck, and shoulders. After a short rest, the employee continued to work until 5 p. m.

The following day Roy Marx saw Dr. Meyer of the Medford Clinic. He consulted Dr. Meyer for several weeks thereafter. The doctor prescribed massaging of the neck. On April 1, 1955, he again consulted Dr. Meyer regarding a soreness in his neck, which he claimed had increased and again on October 4, 1955, at which time he claimed the aches and pains became worse when he carried anything on his shoulders.

In February, 1956, Roy Marx went to the Marshfield Clinic for a heart examination, because he started to have severe pains in his arms and across his chest, which seemed to center in the middle of his chest. An electrocardiogram was taken at the Marshfield Clinic.

In June, 1957, while working for his employer, Roy Marx suffered a severe jolt in attempting to lift a skid, and felt severe pain. The pain left after a short period of time, but Roy Marx decided to go to see Dr. Freeman of Wausau. After physical examination, Dr. Freeman sent Roy Marx to St. Mary's Hospital where a myelogram and laboratory studies were taken. Roy Marx had only missed a few days of work up until the day he was confined to St. Mary's Hospital on June 30, 1957. He was discharged from the hospital on July 4, 1957.

In addition to being employed by Hurd Millwork Corporation, Roy Marx helped to operate his small farm. Up until the date of the hearing Roy Marx had continued to work at the Hurd Millwork Corporation and helped operate his farm.

Roy Marx was examined by Dr. J. M. Freeman on June 25, 1957, and on March 6, 1958; by Dr. Merritt L. Jones on March 6, 1958; and by Dr. W. E. Braun on March 12, 1958.

Dr. J. M. Foerster, a radiologist specialist at St. Mary's Hospital, testified on behalf of the appellant. He stated

that his examination of the X rays taken October 4, 1955, showed a lateral projection of the cervical spine and narrowing between the fifth, sixth, and seventh cervical vertebral bodies, with spurring, hypertrophic bony spurring, most marked at the interspace between the fifth and the sixth, with some loss of the normal cervical curve through this region. His opinion was that the appellant was suffering from osteoarthritis with bony lipping.

Dr. J. M. Freeman, a general practitioner, testified on behalf of the appellant. He was asked:

"Q. . . . what is your opinion, doctor . . . assuming all the facts which Mr. Marx has given here and assuming the facts which you have read into evidence here from your report, assuming the facts are true as stated by Dr. Foerster in his report, the opinion of the X rays taken of Mr. Marx, is there a reasonable probability . . . Assuming all those facts to be true, doctor . . . after examining him thoroughly yourself and after looking at the opinion of Dr. Foerster, as to the X rays, what was your diagnosis, . . .? A. I was of the opinion that this man was suffering from a radiculitis from osteoarthritis of his cervical spine."

Dr. Freeman further testified that Roy Marx was not in any way affected with any heart condition. The doctor also testified that there was a definite and distinct relationship with the accident as the causative factor.

Dr. William E. Braun, testified on behalf of the appellant, and was asked:

"Q. Did you examine the X rays here, taken of Roy Marx at the Medford Clinic as of December 2, 1954, and October 4, 1955? A. Yes, sir.

"Q. What did you find? A. I noticed an arthritic process, the loss of space between C-5 and 6 and between C-6 and 7.

"Q. The X rays then in 1955 show a minor process? A. Yes, sir.

"Q. The X rays of 1954 there was no process? A. Well, it was hard to say. The X rays weren't entirely satisfactory.

What I could see on the oblique view, there was no evidence of any arthritis on that picture.

"Q. . . . doctor, can you say, within a reasonable probability, based upon a medical and surgical standpoint of view, have you not an opinion whether or not, doctor, this trauma that you have heard related because of Mr. Marx's accident caused this osteoarthritis? A. I believe that the accident caused an aggravation of a pre-existing osteoarthritis."

On cross-examination the doctor testified that he would have expected that the complaints of Marx would have appeared sooner following the accident, but the employee stated he had periodic pain, and although the pain became greater a year or two later, the degenerative process is progressive and therefore can be continued and aggravated by lifting and twisting. The X rays of 1954 showed no definite evidence of arthritis. The 1955 X rays showed moderate degeneration, and the X rays of March 12, 1958, showed a definite process. The doctor was asked:

"Q. . . . what, in this particular case, is it that leads you to say that, in Mr. Marx's case, it was accelerated by trauma? A. Well, I believe that the injury that he did sustain was severe and the type of injury certainly could have caused definite trauma to the neck. There is no doubt that he sustained a flexion-type injury to the neck and that would cause damage to the disc, as well as the bony portions of the vertebrae. There was no definite fracture noted but there was loss of space, which indicates damage to the articular cartilage."

Dr. Merritt L. Jones, an orthopedic surgeon, who examined Marx on March 6, 1958, testified on behalf of the respondents, and reported his findings and opinions in a letter dated March 8, 1958, which was introduced into evidence. He had examined all the X rays taken of Marx and testified that his disability was caused by a nerve-root pain resulting from progressive degenerative arthritic changes in the cervical spine. In his opinion, this condition was not

caused by the accident of December 1, 1954, but was the result of a wear-and-tear process taking place in ordinary daily living. He was asked:

"Q. Now, doctor, I'll ask you whether you have an opinion, based on the testimony that Mr. Marx gave at the hearing here today; your review of the various X rays which you saw, taken over the period from 1954 up until the date of your examination on March 8, 1958; based also on your physical examination; whether you have an opinion, to a reasonable medical probability, as to whether the injury which Mr. Marx had on December 1, 1954, caused the arthritis which you found in the cervical region. A. I don't think it did.

"Q. Will you tell us why, doctor? A. Well, this type of arthritis shouldn't be called arthritis because its not an inflammatory process; and that's been proven a great many times over. It would be better to describe it as a wear-and-tear condition that takes place in the weight-bearing joints of the body. It is found very marked in some individuals and hardly at all in others; but it is supposed to be the result of standing on your hind legs; and it occurs particularly in the knees and the hips and in the spine, throughout the spine most-common place probably is in the lumbar region and the second most-common place is in the cervical spine. Now, this degeneration takes place not only in the vertebrae but it also affects the intervertebral discs equally, so that, in a great many of these cases you find a degenerative disc, as well as the vertebra. On the vertebrae you find the hypertrophic spurs, lipping, and that sort of thing; and in the discs you can have the discs actually go to pieces, if it progresses far enough; but the usual indication is narrowing of the intervertebral spaces between the vertebral bodies. It is found in a great many individuals. Its rather common after fifty years of age. It is just as common in desk workers as it is in men or individuals doing hard labor. Some of the very worst cases that you see are in individuals who have never done heavy labor. It's just one of those processes that takes place in the body supposedly due to the wear and tear in life; and it does not affect individuals equally. It is a progressive condition. . . .

"*Q*. And, in your opinion, doctor, then he suffered a hurt at that time but that didn't have anything to do with this osteoarthritis? *A*. Not with the osteoarthritis.

"*Q*. . . . then I'll ask you, doctor—assuming the facts as you heard Mr. Roy Marx testify to, the fact that you have testified to here pertaining to your opinion as to his physical condition; assuming the facts that you have noted from the X rays taken of Roy Marx here at various times; have you an opinion, doctor, based upon a reasonable probability, of whether or not this fall accelerated the osteoarthritic condition? *A*. That is very definitely established. Trauma does not accelerate degenerative changes in the spine. A person with degenerative changes in the spine can hurt himself just like anybody else and it is a known fact that people with this sort of thing sometimes take longer to complete their healing period than an individual that doesn't have it; but it does not accelerate the process."

The appellant Roy Marx had the burden of establishing all facts essential to compensation and the burden of proving that his disability was due to the injury of December 1, 1954.

Dr. J. M. Freeman, a general practitioner, and Dr. William E. Braun, a specialist in the field of arthritis, agreed that there was a causal relationship between Roy Marx's accident and his disability. Dr. Braun stated specifically that the accident of December 1, 1954, aggravated appellant's pre-existing condition of osteoarthritis. Both of these doctors did state that appellant's condition could result without any specific trauma having contributed to it. Dr. Braun's testimony also disclosed that he was unable to see much evidence of arthritis in the X rays taken.

The words, "aggravated" or "accelerated," used in the testimony of the doctors are synonymous.

The rule is well established that the commission's findings on disputed medical testimony are conclusive. The Industrial Commission had the privilege of relying upon Dr. Jones' testimony that the appellant had an advanced degenerative arthritic condition in his cervical vertebrae, which

condition was not due to injury, or accelerated by injury, rather than the testimony given by Drs. Freeman and Braun.

It, therefore, necessarily follows that the commission's findings are conclusive. *Melli v. Industrial Comm.* (1956), 274 Wis. 76, 79 N. W. (2d) 225; *Borden Co. v. Industrial Comm.* (1958), 2 Wis. (2d) 619, 87 N. W. (2d) 261; and *Chequamegon Forest Products v. Industrial Comm.* (1959), 7 Wis. (2d) 487, 96 N. W. (2d) 706.

There being credible evidence on which the findings of the commission may be supported, the judgment is affirmed.

*By the Court.*—Judgment affirmed.

MARTIN, C. J., took no part.